## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| KATRINA MACEROLA | § | |
| *plaintiff* | § | |
| | § | CA No. _____ |
| vs | § | |
| | § | |
| U.S. SILICA COMPANY | § | |
| d/b/a U.S. SILICA | § | JURY TRIAL DEMANDED |
| *defendant* | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Plaintiff Katrina Macerola, ("Plaintiff" hereinafter or "Mrs. Macerola") and files this, her Original Complaint of the Defendant U.S. Silica Company, d/b/a U.S. Silica ( herein after as "Defendant"), and for cause therefore would show the Court as follows:

### I.   PARTIES

1.      Plaintiff Katrina Macerola is a resident of Harris County, Texas.

2.      Defendant U.S. Silica Company is a foreign for-profit corporation, headquartered in Harris County, Texas, and may be served through its registered agent, CT Corp System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3135, USA.

3.      Whenever in this Complaint it is alleged that Defendant(s) committed any act or omission, it is meant that the Defendant(s') officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendant(s) or was done in the routine normal course and scope of employment of the Defendant(s') officers, directors, vice-principals, agents, servants, or employees.

Plaintiff's Original Complaint

## II. VENUE & JURISDICTION

4.      Venue and Jurisdiction are also proper in this district under 28 U.S.C. § 1391(b) as a

substantial part of the events or omissions giving rise to the claim occurred in this

District.

5.      This cause also arises under Federal Question, pursuant to Plaintiff's claims  under the

Americans with Disabilities Act Amendments Act of 2008, under 42 U.S.C. §12101 *et*

*seq*.; and the Family Medical Leave Act of 1993, pursuant to 29 U.S.C. §2601 *et seq*, and

Title VII of 42 U.S.C. §2000e *et seq*.

## III.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      Plaintiff herein stipulates that she has exhausted her administrative remedies which are

required to bring the above styled and numbered cause of action, and in accordance

thereof would show the following.

**(A)      Americans With Disabilities**

7.       A portion of Plaintiff's claims constitute violation(s) of the Americans with

Disabilities Act.  Accordingly, plaintiff has made timely complaint to the EEOC,

under Charge No. 460-2020-03779, and a Notice of Right To Sue was issued by

the U.S. Equal Employment Opportunity Commission, issued on or about

December 11th, 2020. 90 days thereafter would be March 11th, 2021.

8.      Exhaustion occurs when the plaintiff files a timely charge with the EEOC and

receives a statutory notice of right to sue.  *See Dao v. Auchan Hypermarket*, 96

F.3d 787, 788-89 (5th Cir. 1996).  That requirement has been satisfied and the

Complainant has received a timely Statutory Notice of Right To Sue Letter.

9.          Her deadline to timely file this cause of action within 90 days would be March

11th, 2021.  Accordingly, this cause of action is timely filed for the claims which

pertain to the relevant statute of limitations which may apply herein.  As such,

Plaintiff has exhausted her administrative remedies and is justly permitted to bring

the following claims before this honorable Court .

## IV.  FACTUAL ALLEGATIONS

10.     On or about 4/1/2019, Mrs. Macerola began working with U.S. Silica.  Mrs. Macerola

was hired on as the Accounting Lead.  Between her initial hire and her termination from

employment, Mrs. Macerola was not placed in any other position at US Silica.  The outset

of her employment  began with frequent travel to Frederick, Maryland, as the corporate

office was shifting to Katy, Texas.

11.     This back-and-forth travel facilitating the transition lasted for approximately 1.5 months.

Throughout the tenure of her employment, Mrs. Macerola did not receive any negative

performance reviews, verbal or written warnings, or perpetrate any major accounting

errors which would garner immediate termination.

12.     During this stint between Maryland and Texas, Mrs. Macerola's performance was strong

enough to allow her to take over a senior supervisor's job who transferred his work to

Mrs. Macerola – Mr. Kevin Dodds.  Even the company's Controller, Ms. Jill Haney,

approved of Mrs. Macerola's work for US Silica.

13.     In her position as Accounting Lead, Mrs. Macerola was part of a four (4) person team that

successfully transferred the accounting branch of the company to Texas.  Hence her

intimate knowledge of the inner workings of the company's accounting system.

14.     Mrs. Macerola's Houston co-workers included the following individuals: Ms. Donna

        Stokes, Assistant Controller; Ms. Pamela Minnick, Accounting Supervisor; Mrs. Katrina

        Macerola, Accounting Lead; Ms. Shirley Hu, Staff Accountant II; Ms. Carolyn Smith,

        Staff Accountant II; and Ms. Sara Dussair; Corporate HR Manager.

15.     On or about 9/6/2019, during quarter-end on a Friday, Mrs. Macerola went home around

        6pm experiencing difficulty breathing.  Her husband came home to find her on the

        bedroom floor because she could not catch her breath.  She was rushed to the Emergency

        Room of HCA, Cypress and was admitted overnight.

16.     While Mrs. Macerola was admitted at the hospital that evening, she suffered a ventricular

        tachycardia (v-tach) episode and was admitted to the intensive care unit (ICU) and stayed

        there for approximately the next six (6) days.  During this time, Mrs. Macerola's husband

        communicated her condition and situation to US Silica employees Dussair and Minnick.

        Assuming these individuals serving as Accounting Supervisor and Corporate HR

        Manager did their jobs, US Silica was on notice of Mrs. Macerola's medical condition as

        of the date of her admission to HCA and subsequent emergency procedures above.

17.     On or about 9/13/2019, Mrs. Macerola was discharged from the hospital with a wearable

        defibrillator unit known as a  "LifeVest".  This obvious chest harness would be worn by

        Mrs. Macerola until early January of 2020.  A sum of nearly four (4) months wherein she

        would be required to wear this overt, obvious, bulky, ambulatory vest.

18.     Upon conclusion of the instant emergency, Mrs. Macerola was advised by her treating

        physician and specialists that she required at least six (6) weeks for recovery of her

        current condition. In response to this advice, Mrs. Macerola chose to file for Short Term

Disability (STD) while still employed with US Silica. This disability request was granted after submission to MetLife. On or about 9/16/2019, Mrs. Macerola was clinically diagnosed with Severe Heart Failure.

19.    As Mrs. Macerola did not learn of her own heart condition until its first occurrence in September, 2019, she was unable to inform US Silica of her disability until this time. However, with the discovery of the disability, came Mrs. Macerola's knowledge of it, and subsequent ability to inform US Silica of the issue.

20.    On or about 10/21/2019, Mrs. Macerola returned to work after the Short Term Disability leave of approximately six (6) weeks. During these six weeks, the other members of the accounting department allege that they had to completely re-work a critical project, transload allocation, in which Mrs. Macerola was involved with.

21.    Upon her return from leave, Mrs. Macerola had a meeting with US Silica employees Stokes and Minnick, informing them that she was awaiting notification from the hospital for a surgery date for a cardiac ablation procedure. This procedure is intricate, and would require additional medical leave time for Mrs. Macerola.

22.    In the course of this discussion, Mrs. Macerola was questioned by Stokes regarding the time she would have to take off for all of the necessary and associated doctor appointments. These questions also extended to the exact timing of Mrs. Macerola's surgery, becoming more intrusive than necessary.

23.    Specifically, it was requested by Ms. Stokes that Mrs. Macerola not engage in this emergency life-saving surgery during the end of the month "because we will be busy." (Presumably with projection completions.)

24.     It should be noted that Ms. Stokes did not overtly deny Mrs. Macerola's surgical leave
        requests outright, because at this point no surgical appointments had yet been scheduled.
        However, she was put on notice that Mrs. Macerola *would* require such leave when the
        time came – which would have occurred *after* the one year anniversary of Mrs.
        Macerola's employment with US Silica.

25.     Ms. Stokes verbally made it clear that Mrs. Macerola should not engage in future ablation
        surgery during month-end accounting "because we will be busy."  A manager does not
        have to explicitly refuse a date to engage in passive aggressive intimidation to force
        employees to conform to unlawful, or job-threatening, comments.

26.     After the above disconcerting conversations, Mrs. Macerola approach Ms. Dussair – US
        Silica's Human Resources Corporate Manager – to report this comment by Stokes.
        Human Resources then informed Mrs. Macerola that "US Silica offers unlimited sick
        days" and that [ Mrs. Macerola's ] "health comes first."

27.     Macerola came back from medical leave and completed the aforementioned transload
        allocation project, as only approximately 50% of the required project work had been done
        in her absence.  At no point did US Silica offer this six week medical leave. US Silica did
        not grant this leave. US Silica did not offer time off.  It was paid for by the Plaintiff and
        medically qualified for after analysis by a physician.  Moreover, this type of Short Term
        Disability leave is not dependent on, or related to, an employee's length or tenure of
        employment. This Short Term Disability leave was *required* by Mrs. Macerola's
        physicians.

28.   Despite Mrs. Macerola's explanations and inquiries, and knowing the full context and situation circumstances of Mrs. Macerola's medical condition, Ms. Dussair did not advise Mrs. Macerola to apply for protected Family Medical Leave (FMLA).  In point of fact, Ms. Dussair never bothered to examine Mrs. Macerola's eligibility or provide her with documentation indicating eligibility or non-eligibility.  She simply explained to Mrs. Macerola that "[she] didn't need it" when Mrs. Macerola brought up her qualifications to her.

29.   After the above disconcerting conversation, Mrs. Macerola approached Ms. Dussair – US Silica's Human Resources Corporate Manager – to report this comment by Stokes. Human Resources then informed Mrs. Macerola that "US Silica offers unlimited sick days" and that her "health comes first."  After this conversation with US Silica Human Resources, Stokes begin to treat Mrs. Macerola differently, inferring there was a possible discussion between HR and Stokes, or that Stokes was made aware of Mrs. Macerola's concerns regarding the conversation on the 21st.

30.   On or about 10/24/2019, Mrs. Macerola received several emails from Stokes wherein Ms. Stokes adopted a passive-aggressive bent.  Ms. Stokes then began to ignore Mrs. Macerola for several days thereafter, intentionally going out of her way to alienate Mrs. Macerola. Given the nature of the medical concerns Mrs. Macerola had suffered, and the necessity to complain to US Silica HR, this caused no small amount of trepidation and anxiety in Mrs. Macerola.  Naturally the anxiety she suffered took a physical toll on her, and became difficult for Mrs. Macerola to breathe.

31.     At approximately 2pm, on the afternoon of 10/24/2019, Mrs. Macerola's anxiety caused her heart rate to rise, and she began to experience severe difficulty breathing.  Shortly thereafter Mrs. Macerola fell to the floor of her cubicle and Ms. Minnick brought her into Ms. Stokes' office as to be out of view from the rest of the office.  Mrs. Macerola called her father to have him take her home while the front desk receptionist moved her to US Silica's 'Mother's Nursing Room' while she waited for her father.  Clearly, Ms. Minnick, Ms. Stokes, and a number of other US Silica employees became aware of Mrs. Macerola's medical condition if they had not already been made aware by that time.  The next day, 10/25/2019, Mrs. Macerola took a personal sick day due to the strenuous nature of the previous day's events.

32.     In early November, 2019, Mrs. Macerola again approached US Silica's Human Resources department regarding passive-aggressive emails and communications from Ms. Stokes.  This behavior was so apparent that Ms. Pamela Minnick – Mrs. Macerola's direct supervisor – also reported Stokes' treatment of Mrs. Macerola to the US Silica Human Resources department.

33.     On or about 11/23/2019, US Silica completed a round of lay-offs which comprised approximately 10% of the employees within the Houston Office.  Despite her multi-million dollar error in mid 2019, Ms. Stokes was not included in this reduction in force.  Nor was Mrs. Macerola included in this reduction.

34.     Weeks prior, Ms. Carolyn Smith made a $32 Million entry error, which was reviewed and approved by Ms. Stokes.  This error did not lead to a financial loss to US Silica – unlike Ms. Stoke's $2.4 Million error.

35.     There were three (3) major errors in total, involving Mrs. Macerola in some form or

fashion. (A)  $32 million entry error which was caused by Carolyn Smith and approved

by Donna Stokes; (B) a $2.4 million scam which actually occurred due to Donna Stokes'

error; and (C) a $26 million entry error –  during the last month of Mrs. Macerola's

employment, in which was caught in the review process, exactly where it was supposed to

get caught.

36.     To be clear, by Ms. Stokes making efforts to bypass and subvert Mrs. Macerola's position

in the work stream, she had instructed Ms. Carolyn Smith to report directly to herself –

despite the fact that Ms. Smith was supposed to directly report to Mrs. Macerola.  By

engaging in this subversion, Ms. Stokes facilitated the execution of this $32 Million

dollar entry error.  This may be substantiated by a simple review of the Defendant's meta-

data and processing messages conducted through Skype within their in-house servers.

However, on information and belief, Troung Nguyen, the US Silica IT Specialist, was

instructed to permanently delete and scrub said messages from the server.

37.     It is important to note that Mrs. Macerola was never pulled aside and corrected over *any*

error(s). No coaching was done. No after-action reports were taken. No disciplinary

measures were instituted. Not even a warning.  Her errors were caught during the normal

approval process for the company and the mistakes were rectified in a timely fashion,

causing no financial harm to US Silica.

38.     On or about 12/2/2019, Mrs. Macerola entered into a  nine (9) hour cardiac ablation

surgery at Houston Methodist, Debakey Center, in an effort to remedy her heart failure.

However, the surgery was not successful in ridding her of the condition, and she was

notified that she would require a permanent pacemaker/defibrillator implanted in the near future after taking a few months to heal from this last procedure.

39.     On or about 12/4/2019, Mrs. Macerola was discharged from Houston Methodist. However, on 12/5/2019, Mrs. Macerola's father rushed her back to ER due to loss in vision, low blood pressure, admitted to HCA Cypress hospital.  Finally, on 12/7/2019, Mrs. Macerola was again discharged from HCA Cypress.

40.     On or about 12/9/2019, Mrs. Macerola began working from home for the next two (2) weeks as instructed by her cardiologists and physicians, and ultimately returned to the office for work on or about 12/23/2019.

41.     Mrs. Macerola's performance record remains untarnished. In point of fact, she qualified for a performance-based bonus at the conclusion of 2019, just prior to her termination. Despite the fact that her bonus was reduced from it's usual integer, it is our understanding that *all* employee bonuses were reduced by several hundred dollars from the top level, down.  If Mrs. Macerola's performance had been negative in the form and fashion which her employer had previously claimed, she was not have qualified for her bonus at all.

42.     On multiple occasions Mrs. Macerola approached the US Silica Human Resources Corporate Manager, Ms. Sara Dussair– not only about issues with Stokes and Smith, but also regarding FMLA leave for her imminent surgical requirements.  By and through these interactions, Ms. Dussair is a fact witness to all events which transpired, and all concerns made the basis of Mrs. Macerola's FMLA claim.

43.     On or about 1/8/2020, when Mrs. Macerola requested leave after a point in time after the 12 month mark when she would qualify for FMLA, Ms. Dussair ostensibly brushed her

off, saying "Why? You don't need to file, you don't have that many doctor's

appointments."

44.  This response is incongruous with a human resources representative with even the

slightest knowledge of the Family Medical Leave Act and its requirements – especially

one that already has factual knowledge of a life threatening condition.

45.  Mrs. Macerola approached HR because she was concerned about the security of her

employment moving forward in light of her strained relationship with Ms. Stokes – a

management level US Silica employee with the power to immediately terminate

Macerola's employment.

46.  Mrs. Macerola attempted to show Ms. Dussair an example of applicable FMLA

paperwork, without result.  Because of this Corporate Human Resources Manager's blase

and cavalier attitude, and clear dearth of knowledge regarding the Family Medical Leave

Act, Mrs. Macerola was forced to request a possible date for FMLA leave from the

Payroll Manager, Jennifer Briggs.

47.  It should be noted that the Payroll Manager was the employee that explained to Mrs.

Macerola what FMLA was, and the purposes for it. Not US Silica's HR staff.

48.  On or about, 1/13/2020, Mrs. Macerola again reported to both Ms. Dussair in HR &

Ms. Minnick, her immediate supervisor, about continuous passive-aggressive treatment

from Stokes and insubordinate treatment from Smith.

49.  The next day, on  1/14/2020, Mrs. Macerola spoke with Stokes directly about her

negative treatment, as well as an increase in insubordination from Ms. Smith, who

reported to Mrs. Macerola.

50. On or about 1/15/2020, Macerola, Smith, and Minnick have a meeting and discuss Stokes' activity and attitude from the prior weeks. All three collectively agree that Stokes has been obfuscating and "intentionally driving a wedge" between Macerola, and Ms. Smith who reports directly to Mrs. Macerola. This was accomplished by leaving Mrs. Macerola out of communications regarding approvals and projects and having Smith report directly to Stokes.

51. On personal information, Stokes had instructed Smith to submit approvals & business communication directly to Stokes, intentionally excluding Mrs. Macerola (Smith's direct supervisor) from being able to review or co-opt the approvals and communications. This insubordinate behavior directly caused an incorrect entry of $32 Million dollars USD because Stokes reviewed something incorrectly of Smith's without Macerola's review and knowledge.

52. In February of 2020, Mrs. Macerola received her annual performance review, which held *positive metrics across the board*. US Silica's performance reviews contain three (3) rankings: Low, Average, and Excellent. On personal knowledge, most people receive average unless they accomplished something significant during the year or significantly helped the business financially.

53. Further, Mrs. Macerola was told during her review that she "was the strongest accountant on our team", and that she was "a great part of the team, a "team player"." It is our understanding this US Silica has a copy of that review, including the metrics and performance notes issued by Ms. Minnick. Mrs. Macerola's review was robust enough to garner a bonus in February of 2020. Yet she would be terminated within the following

month for unknown reasons.

54.    On or about 3/15/2020, Mrs. Macerola received her bonus check.  It is our understanding that US Silica does not award bonuses to poor performers or employees with legitimate performance issues and concerns, or who are on a performance improvement plan at the time.

55.    On or about 3/24/2020, after returning from a one week, pre-planned vacation, Mrs. Macerola received a call that she was laid-off from Ms. Minnick and Ms. Dussair. They further elaborated that about 10% of the company had been cut as part of a reduction in force.  However, a contact of Mrs. Macerola's who is still employed with US Silica informed her that raises will still be given out to remaining employees.

56.    US Silica employs more than fifty (50) individuals in it's Houston offices.  It qualifies as an "Employer" under state and federal guidelines.  And Mrs. Macerola is technically "eligible" despite being terminated from employment approximately one (1) week shy of her 12 month FMLA qualification.

57.    While Mrs. Macerola's performance has never before been in question, it is our understanding that US Silica has other employee's whose performance has not only been sub-par, but bordering on gross negligence.  On personal knowledge, we are aware that Ms. Donna Stokes, the Assistant Controller for US Silica, made a serious error which resulted in the payment of approximately $2.4 Million dollars (USD) to a fraudulent company in the middle of FY 2019.  To our knowledge, Ms. Stokes is still employed by US Silica, and was not included in the reduction in force which whittled out 'poor performers'.

58.   US Silica did not provide Mrs. Macerola with extensive paid sick leave to accommodate her condition.  Mrs. Macerola had to apply for her disability leave through Met Life and was approved by the Third Party Carrier after paying for the benefit and it was approved. This was not a gracious accommodation burden which US Silica had to shoulder. Thereafter, US Silica did not propose or pursue any additional or alternative accommodations for Mrs. Macerola and her life threatening condition. Any dialogue ceased in its tracks. Case in point, Mrs. Macerola's own physician instructed her not to work for 6 weeks, and sent these instructions directly to US Silica's Human Resources department and MetLife.

59.   At no point during the tenure of her employment with US Silica was Mrs. Macerola ever disciplined.  She was never demoted, never transferred, and her pay was never lowered. To  date, the Defendant has totally failed to supply any legitimate business reasons unrelated to the Plaintiff's protected characteristics or activities.  However, Mrs. Macerola *was* terminated after requesting medical leave and accommodations, and mere days prior to completing the standard one (1) year pre-requisite for Family Medical Leave.

60.   Finally, US Silica absolutely cannot claim that they were unaware of Mrs. Macerola's medical condition.  After her initial cardiologic incident, Mrs. Macerola was required to wear a large cumbersome vest which was essentially a wearable defibulator unit. Over the course of three (3)  months, anyone within visual range of her could not have missed it. And visual range was required for the company's Halloween office function in October. This event occurred in the US Silica, Houston break room, during the lunch hour, and the

company's CEO, CFO, and in-house legal counsel were in attendance, along with other employees.  Mrs. Macerola was wearing the unit during the event.

61.     Moreover, Mrs. Macerola suffered a cardiologic event and dropped to the floor while at work. She was assisted by Ms. Minnick and the front desk receptionist, and placed in the office of Ms. Stokes while she waited for her father to pick her up.

62.     Finally, the VP of Finance of US Silica jokingly made comments to Mrs. Macerola about her wearable defib unit, noting that while she wore the unit she "looked like a parking meter maid."  It is Mrs. Macerola's contention that her continued medical condition, her multiple complaints of subversion and interference in her duties by Ms. Stokes over the course of 6 months, and the impending arbitrary one (1) year marker for her FMLA eligibility, led the ultimate decision maker(s), and the Cat's Paw company officers which held both animus against Macerola and influence with same Decision Maker(s), led to the determination to erroneously include her in the Reduction In Force.

## V.    FMLA ENTITLEMENT INTERFERENCE
## UNDER 29 CFR § 825.220 *et seq*

63.     All factual allegations above are hereby reincorporated *in haec verba*.

64.     Any violation of the FMLA or its regulations constitutes interference.  29 C.F.R. Sec 825.220(b).  An ***entitlement*** claim is a subset of interference claims under which "an employee claims the denial of a benefit to which she is entitled under statute."  *Bosley v. Cargill Meat Solutions Corp*., 705 F.3d 777, 780 (8th Cir. 2013) (quoting *Pulczinski v. Trinity Structural Towers, Inc*., 691 F.3d 996, 1005 (8th Cir. 2012).

65.     To prevail on an entitlement claim, a Plaintiff must establish that they were **(A) eligible**

for FMLA coverage, and that they **(B) <u>gave notice</u>** to their [former] employer of their

impending need for FMLA leave, or cause to engage in the dialogue thereof.

66.      Specifically, a Plaintiff must show: (1) that he is an 'eligible employee'; (2) the defendant

is an 'employer'; (3) the employee was entitled to leave under the FMLA; (4) the

employee gave the employer notice of his intention to take leave; and (5) the employer

denied the employee FMLA benefits to which he was entitled."  *Cavin* v. *Hond Mfg.*, 346

F.3d 713, 719 (6th Cir. 2003).    "To prevail on an interference claim, a plaintiff must

establish that (1) he is an 'eligible employee'; (2) the defendant is an 'employer'; (3) the

employee was entitled to leave under the FMLA; (4) the employee gave the employer

notice of his intention to take leave; and (5) the employer denied the employee FMLA

benefits to which he was entitled." *Id.*

**(A)     Eligibility**

67.      In the instant case, Mrs. Macerola was terminated from employment days prior to a

complete calendar year, approximately 1,250 hours worth of work, or 12 months of

employment -- the standard for eligibility of an employee to reach coverage under the

FMLA. Mrs. Macerola requested FMLA leave prior to the 12 month temporal deadline.

However, even if she did not reach that 12 month qualifier, Mrs. Macerola *did* have

accrued time off and leave which would have extended beyond the eligibility date.  In

other words, she is able to "bridge the gap" with her accrued leave.

68.      In point of fact, the very language of the statute contains a provision which covers Mrs.

Macerola.  In particular, Regulation 110(d) expressly allows employee to use non-FMLA

leave to reach their eligibility date:

The determination of whether an employee … has been employed by the employer for a total of at least 12 months must be made as of the date the FMLA leave is to start.  An employee may be on non-FMLA leave at the time he or she meets the 12-month eligibility requirement, and in that event, any portion of the leave taken for an FMLA-qualifying reason after the employee meets the eligibility requirements would be FMLA leave.

See 29 C.F.R. Sec 825.11(d)(emphasis added); see also *Harrell v. Jacobs Field Servs. N. Am. Inc.*, No. 09-CV-02320, 2011 WL 3044863, at *4 (C.D. Ill. July 25, 2011) (holding that Sec 825.110(d) allowed plaintiff to reach FMLA eligibility date through other forms of leave).

69. The only reason the Mrs. Macerola was not able to reach her eligibility date is because US Silica erroneously terminated her before she could do so.  Any court, therefore, *shall* find that Mrs. Macerola did meet the Eligibility requirement under the FMLA framework.

**(B)     Notice**

70. Under the FMLA, the notice requirement is made flexible in favor of the employee in order to serve its fundamental purpose.  FMLA regulations require employees to provide thirty (30) days notice of future leave "if practicable."  29 C.F.R. Sec 825.302(a).  If there is a "change in circumstance" or a "medical emergency," notice "must be given as soon as practicable." *Id.*  "As soon as practicable" means soon as both possible and practical, taking into account all of the facts and circumstances in the individual." 29 C.F.R. Sec 825.302(b).  Mrs. Macerola  has plainly met this requirement, having given notice to US Silica on multiple occasions and in multiple forms, including email.

71. Moreover, pursuant to the Department of Labor, once an employer becomes aware that an employee's need for leave is for a reason that *may* qualify under the FMLA, the employer

*must* notify the employee if her or she is eligible for FMLA leave and, if eligible, *must* also provide a notice of rights and responsibilities under the FMLA.  If the employee is not eligible, the employer *must* provide a reason for ineligibility. See DOL form WH-1420 and 29 U.S.C. §2601 *et seq*. (emphasis added)

72.     As the requirements of Eligibility and Notice have been met, Mrs. Macerola was objectively qualified for FMLA leave prior to her inclusion in the Reduction In Force, and therefore afforded all protections under its auspices from the moment she endured her serious health condition.  To be clear, US Silica did immutably interfere with Mrs. Macerola's rights under the Family Medical Leave Act.

73.     This issue is compounded by the immutable fact that – where US Silica and its managing officers *knew* of Mrs. Macerola's medical issues – they unilaterally denied her attempt to obtain FMLA coverage.  Even going so far as to stem the discussion and, without even making an eligibility determination, inform Mrs. Macerola that she "didn't need FMLA leave."

74.     Mrs. Macerola has established a *prima facie* instance of Interference by the Defendant in that: (1) Mrs. Macerola was an eligible employee at the time of incident pursuant to the definitions and tenants of the Family Medical Leave Act of 1993 as outlined in 29 U.S.C. §2601 *et seq*.[1]; (2) the Defendant, US Silica, is an 'employer', pursuant to the above qualifications met in the Jurisdiction and Venue necessities of this cause of action; (3)

---

[1] Plaintiff suffers from a 'serious health condition'; defined by the FMLA as an illness, injury, or impairment, or physical or mental condition that involves either (i) inpatient care in a hospital, hospice, or residential medical care facility; or (ii) continuing treatment by a health care provider. 29 U.S.C.§§ 2601, 2611(11); see also 29 C.F.R.§ 825.114.

Mrs. Macerola would have been entitled leave, pursuant to the FMLA, at the time of her surgeries and medical procedures; (4) Mrs. Macerola gave the Defendant proper notice [2] of her intention to take medical leave; and (5) the Defendant denied Mrs. Macerola the FMLA benefits to which she was entitled.  *Id.*

75.   *At 451*; [A]n employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in FMLA 2613(a)(1) has occurred." *Id.* See also *Price v. City of Fort Wayne*, 117 F.3d 1022, 1025-26 (7th Cir. 1997); *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 763 (5th Cir. 1995) (invoking FMLA by name is not necessary).

## VI.    FMLA RETALIATION
## UNDER 29 CFR § 825.220 *et seq*

76.   All factual allegations above are hereby reincorporated *in haec verba*.

77.   To establish a *prima facie* case of retaliation, the Plaintiff must show (1) that they exercised or attempted to exercise rights afforded by the FMLA; (2) they suffered an adverse employment action; and (3) the adverse employment action had a causal connection to the protected activity. [ Unquestionably, termination is the ultimate adverse employment action. And extreme temporal proximity functions as an immutable causal nexus. ]

---

[2] Once an employer becomes aware than an employee's need for leave is for a reason that *may* qualify under the FMLA, the employer *must* notify the employee if her or she is eligible for FMLA leave and, if eligible, must also provide a notice of rights and responsibilities under the FMLA.  If the employee is not eligible, the employer *must* provide a reason for ineligibility.(emphasis added) [Department of Labor form WH-1420] Plaintiff would argue that Type I Diabetes would qualify under the definitions of 29 U.S.C. §2601 *et seq*.

78.     Having already determined that Mrs. Macerola was FMLA-eligible at the time of termination based on her ability under the statute to utilize accrued leave to "bridge the gap", the only point remaining in dispute is whether the Plaintiff's termination was causally connected to eventual, impending FMLA leave.

79.     US Silica has already stipulated that Mrs. Macerola was terminated as part of a Reduction In Force – and that her involvement in said reduction was due to her "poor performance". ( Reduction In Force Separation Notice is attached herein as Exhibit  A  )  Fortunately, Mrs. Macerola has zero negative performance reviews, demotions, performance improvement plans, records of verbal or written warnings, disciplinary coachings, or re-trainings.

80.     However, US Silica employees such as Ms. Shirley Hu (Staff Accountant II), who allegedly did not qualify for her annual bonus and was on a Performance Improvement Plan at the time of the Reduction in Force, and Ms. Stokes who negligently executed a multi-million dollar error, somehow remained employed.  To our knowledge, neither of these employees have requested FMLA leave similar to Mrs. Macerola.

81.     In other words, the proffered reason for Mrs. Macerola's inclusion in the reduction in force is a fabrication at best. An excuse at worst.  The total dearth of negative performance evaluations for Mrs. Macerola, combined with her medical concerns brought to light during the course of her employment at US Silica, as well as the retention of employees whose performance has bordered on gross negligence, has created an inference of pretext too broad for any court to ignore.  Any so-called legitimate non-discriminatory reason proffered by US Silica merely sets the predicate for pretext.

## VII.   ADA DISCRIMINATION

82.    All factual allegations above are hereby reincorporated *in haec verba*.

**(A)    DISCRIMINATION, RETALIATION, COERCION, & INTERFERENCE UNDER THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT OF 2008, AS AMENDED, PURSUANT TO 42 U.S.C. §§ 12101, 12203(a) & (b) *et seq.***

83.    In order to establish a *prima facie* claim for discrimination under the ADAAA it must be demonstrated that the employee: (1) is disabled as defined under the ADAAA; (2) is qualified to perform the essential functions of the position occupied or the position sought, with or without a reasonable accommodation; and (3) that the circumstance suggest that the employee was subjected to an adverse employment action based on that disability. *Hagood* v. *Cty. of El Paso*, 408 S.W.3d 515, 523 (Tex. App.—El Paso 2013, no pet.); *EEOC* v. *LHC Group, Inc.*, 773 F.3d 688 (5th Cir. 2014). See also *Walton* v. *U.S. Marshal Service*, 492 F.3d 998 (9th Cir. 2007); *Wilking* v. *County of Ramsey*, 153 F.3d 869 (8th Cir. 1998).

84.    It is Mrs. Macerola's contention that pursuant to the ADAAA, she has established a *prima facie* case of discrimination under those selfsame acts. In satisfaction of the requisite elements outlined in 42 U.S.C. § 12112, *et seq*. & 29 C.F.R. § 1630, *et seq*. Mrs. Macerola would show that she: (1) was an employee with a known disability pursuant to the ADAAA; (2) was qualified for the position in question and completely able to perform its essential functions with reasonable accommodation [ alterations in scheduling, scheduling accommodations with regards to the effects of her medication, time off for surgery, restroom breaks, protected medical leave, etc. ]; and (3) that

circumstances overwhelmingly suggest that she was subject to adverse employment

actions [ termination, etc. ] based on that disability. *Id.*

85.     If the plaintiff / employee is unable to show direct evidence of discrimination, then

the Court applies the  burden-shifting framework established in *McDonnell Douglas*

*Corp*. v. *Green*, 411 U.S. 792, 802-03 (1973).  See *Adams* v. *Zucker Enterprises, Inc.*,

705 N.W.2d 105 (Iowa App. 2005).  The employee can prove the employer's articulated

justification is merely pretextual "either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that

the employer's proffered explanation is unworthy of credence."  *Fitzgerald* v. *Action,*

*Inc.*, 521 F.3d 867, 872 (8th Cir. Ark. 2008).

86.     Moreover, "Discrimination" is defined to include "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified

individual with a disability."  42 USC §12112(b)(5)(a).  "Reasonable accommodations"

are those accommodations that the employer can implement without imposing "an undue

hardship on the employer's business."   See *Heaser* v. *The Toro Co.*, 247 F3d 826, 830

(8th Cir. 2001)

**(B)     DISABILITY DISCRIMINATION PURSUANT TO CHAPTER 21 OF THE**
**         TEXAS LABOR CODE**

87.     The Plaintiff hereby mirrors her federal claims within the Texas Commission on Human

Rights Act, or the TCHRA, as encompassed within Chapter 21 of the Texas Labor Code.

Under the Texas Commission on Human Rights Act, as codified in Chapter 21 of the

Texas Labor Code,  "an unlawful employment practice is established when the

complainant demonstrates that... disability was a *motivating factor* for an employment

practice, even if other factors also motivated the practice." Tex. Labor Code § 21.125

(emphasis added) [3]

88.   As the 5th circuit has, time and again, allowed Title VII arguments and case law to stand

as a guideline for state level causes of action brought forth under Chapter 21 of the Texas

Labor Code, Plaintiff will refrain from duplicative arguments and causal arguments and

refer to Section A as crafted above.

## VIII.   ADA FAILURE TO ACCOMMODATE

89.   All factual allegations above are hereby reincorporated *in haec verba*.

90.   Courts have provided streamlined elements necessary to prove a *prima facie* case of

Failure to Provide Reasonable Accommodation by an employer. As noted in CFR 29 §

1630.9(a): *"It is unlawful for a covered entity not to make reasonable accommodation to*

*the known physical or mental limitations of an otherwise qualified applicant or employee*

*with a disability, unless such covered entity can demonstrate that the accommodation*

*would impose an undue hardship on the operation of its business." Id.*

**(A)   FAILURE TO PROVIDE REASONABLE ACCOMMODATION UNDER**
**42 U.S.C. § 12182 *et seq***

91.   These *prima facie* requirements can be distilled into four elements; (1) The employee in

question has a disability as defined by the ADAAA, (2) the employee informed the

---

[3]Amending the original "because of" threshold, replacing it with a mere "motivating factor" burden of proof. *See* Tex. Lab. Code **Sec. 21.125.** 'CLARIFYING PROHIBITION AGAINST IMPERMISSIBLE CONSIDERATION OF RACE, COLOR, SEX, NATIONAL ORIGIN, RELIGION, AGE, OR *DISABILITY* IN EMPLOYMENT PRACTICES'

employer of his condition and requested an accommodation, (3) there was an accommodation available that would have been effective, and would not have imposed undue hardship on the employer, and (4) the employer failed to provide an accommodation.[4]

92.     It is undisputed that the accommodations process for any employee with a disability should be an open dialogue with the employer, allowing for an interactive process to reach an optimal conclusion that serves both the needs of the employee and the capacity of the employer.[5]  In other words, employer and employee must work together in good faith, back and forth, to find a reasonable accommodation.  *EEOC* v. *Chevron Phillips Chem Co.*, 570 F.3d 606, 621–22 (5th Cir. 2009).  Failure by the Employer to engage in this process may necessarily lead to a reversal of any summary judgment granted in favor of a defendant employer.[6]

93.     This should be an ongoing, reciprocal process, not one that ends with "the first attempt at accommodation," but one that "continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed."  *Humphrey* v. *Memorial Hosps. Ass'n*, 239 F.3d

---

[4]An employer's obligations under the ADA are triggered once the employer becomes aware that an individual with a disability *may* require reasonable accommodations to perform the essential functions of his or her position. (Emphasis added) ( 29 CFR §§ 1630.9(a), 1630.9, App. (1995).)

[5]Once an employer becomes aware that reasonable accommodation *may* be required, the employer *must* initiate the interactive process to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." (Emphasis added) ( 26 CFR Sec 1630.2(o)(3))

[6]*EEOC* v. *LHC Group, Inc.*, 773 F.3d 688 (5th Cir. 2014) Reversing summary judgment for the employer, the court held that the defendant's failure to engage in the interactive process helped to create genuine issues of material fact.

1128, 1138 (9th Cir. 2001).

94.     Such was not the case between US Silica and Mrs. Macerola.  Despite Macerola's

        requests for accommodations of any nature which might assist her, and reaching out to

        US Silica's Human Resources representative to try to find a workable solution to her

        health concerns, US Silica failed Mrs. Macerola at multiple intervals.  Mrs. Macerola was

        ultimately left with US Silica's Human Resources representative "calling an audible" and

        simply deciding that FMLA was not required, and that she could simply take some time

        off with "unlimited sick leave." HR thereafter failed to even engage with Mrs. Macerola[7],

        despite the apparent flagrant performance issues that never garnered a single warning,

        coaching, or performance improvement plan. Despite the multi million dollar entry error,

        for which Mrs. Macerola was *never* even coached about. But instead, US Silica chose to

        dispose of this medical malady by simply folding her into a convenient reduction in force.

**(B)     FAILURE TO PROVIDE REASONABLE ACCOMMODATION UNDER
         CHAPTER 21 OF THE TEXAS LABOR CODE**

95.     For a plaintiff to show discrimination based on the denial of a reasonable

        accommodation in Texas, the plaintiff must show: (1) that he is an individual who

        has a disability within the meaning of the ADA/ADAAA; (2) that an employer

        covered by the statute had notice of his disability; (3) that with reasonable

        accommodations he could perform the essential functions of the position; and (4)

        that the employer has refused to make such accommodations. *Davis* v. *Cty. Of*

---

[7]*Cutrera* v. *Board of Supervisors of Louisiana State Univ.*,429F.3d108,113 (5[th]Cir.2005)
(reversing summary judgment an holding that "[a]n employer may not stymie the interactive process of
identifying a reasonable accommodation for an employee's disability by preemptively terminating the
employee before an accommodation can be considered or recommended").

*Grapevine*, 188 S.W.3d 758 (Tex. App.—Fort Worth 2006, pet. denied).

96.     Whether under State or Federal purview, in order to reach a reasonable accommodation,

the interactive process must be triggered.  In most cases, it is the employee's

responsibility to request a reasonable accommodation, 29 C.F.R. Pt. 1630 App., 1630.9,

and it is this request that triggers the interactive process.  *E.E.O.C.* v. *Chevron Phillips*

*Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009).

97.     *However*, there are exceptions, one of which being that a specific request may not be

required if the need is *obvious*.[8]  (emphasis added) See *U.S. E.E.O.C.* v. *UPS Supply*

*Chain Solutions*, 620 F.3d 1103, 1114 (9th Cir. 2010);  *Brady* v. *Wal-Mart Stores Inc*.,

531 F.3d 127 (2d Cir. 2008); See also *E.E.O.C.* v. *Chevron Phillips Chemical Co., LP*,

570 F.3d 606, 621 (5th Cir. 2009).  Mr. Torr's condition was made obvious, not only by

his emails to his managers, but also his physical condition – which is plainly evident to

anyone who observes him.

98.     There are also several exceptions to what must be in an accommodations request.

First, it need *not* be in writing, pursuant to *Taylor* v. *Pheonixville Sch. Dist*., 184 F.3d

296, 313 (3rd Cir. 1999).  Second, it does *not* have to mention the ADA or use the phrase

"reasonable accommodation.". See *E.E.O.C.* v. *Chevron Phillips Chemical Co., LP*, 570

F.3d 606, 621 (5th Cir. 2009).  Third, it need *not* identify the specific medical condition

for which the employee seeks accommodation, if the employer is already aware of it. *Id.*

Fourth and finally, the employee does *not* have to request the correct accommodation or

---

[8] It is our contention that, given Mrs. Macerola's history of wearing a "meter maid" defib chest harness and falling to the floor in Ms. Stoke's office after a collapse qualify as "obvious" for purposes of our arguments.

give all the details of the accommodation requested. *Id.* at 621-622.  Needless to say, a

significant onus is lifted from the employee's shoulders in regards to this arena, and was

not required of Mr. Torr at any time.

**(C)   MACEROLA IS *NOT* REQUIRED TO SHOW BURDEN SHIFTING under the AMERICANS with DISABILITIES AMENDMENTS ACT of 2008**

99.     These claims, as the *Davis* court explained, are <u>not</u> analyzed under a burden-shifting

framework. See *Davis*, 188 S.W.3d at 758–59.  The *Davis* court reasoned that

"Section 12112(b)(5)(A) of the ADA states that 'unless [the employer] can

demonstrate' an undue burden, it may not discriminate." *Id.* at 758 (quoting 42

U.S.C.§ 12112(b)(5)(A)). The Texas Labor Code contains an analogous provision.

*Id.* (quoting TEX. LAB. CODE § 21.128). Therefore, under both federal and Texas

law, "the employee has the burden to show that the employer failed to implement a

reasonable accommodation, and the employer can defend by showing a business

necessity or undue burden." *Id.*

100.    Adopting an analysis from the United States Court of Appeals for the Seventh

Circuit, the *Davis* court concluded that the burden-shifting framework does *not* apply

in these cases because "if the plaintiff proved the elements alleged, he would establish a

direct violation of the ADA, and thus, there is no need for indirect proof and burden

-shifting." *Id.* (citing *Bultemeyer v. Fort Wayne Cmty. Schs*., 100 F.3d 1281,

1283–84 (7th Cir. 1996)).   In consideration this, it should be noted that US Silica has

failed to show any undue burden at any point during Macerola's employment and need for

accommodations.

101.  Mrs. Macerola's claim is crystalized in the fact that where she had an obvious condition which required some sort of accommodation, and where her performance was devoid of improvement plans, warnings, reprimands, or coachings, she was the object of US Silica's intentional discrimination against her condition, a situation compounded by it's abject failure to engage in even the first step of accommodation or FMLA analysis and determination, despite her "meter maid" vest.[9]

## IX.   INFERENCE OF PRETEXT

102.  Be advised that it is our assertion that Mrs. Macerola's inclusion in the Reduction In Force is erroneous and only serves as a pretextual veil to accomplish FMLA interference and retaliation.  Staff Accountant II, Ms. Shirley Hu, whom, on personal knowledge did *not* qualify for her annual bonus, was on a Performance Improvement Plan at the time of Macerola's termination, and was ***not*** included in the Reduction In Force.

103.  Ms. Stokes herself made a **multi-million dollar** error bordering on gross negligence. These other employees have not required FMLA leave during the applicable time frame of Mrs. Macerola's concerns as listed above.  However, despite the fact that the above employees have displayed serious performance concerns, they were not included in the reduction in force. What a coincidence.

104.  The fact that there is at least one comparator which we may cite to reflect the erroneous application of the Reduction In Force to Mrs. Macerola is an immutable display, not only

---

[9]Where an employer is found to have engaged in *intentional* discrimination on the basis of an individual's disability, it can be held liable for Compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, as well as punitive damages. (emphasis added) 42 U.S.C. §1981a(a)(2), (b).

of pretext, but also crystalizing the above claims of FMLA Interference and FMLA Retaliation, and disability discrimination.

105.    As US Silica has failed to follow it's own policies and procedures, and done so with blatant disregard to the status of both Mrs. Macerola and the co-worker comparators, it is our contention that a presumption of pretext has been raised which is too robust to be overcome by summary judgement.

106.    "[W]hen an employer's stated motivation for an adverse employment decision involves the employee's *performance*, but there is *no supporting documentation*, a jury can reasonably infer pretext." (Emphasis added)  See *Lloyd* v. *Georgia Gulf Corp.*, 961 F.2d 1190, 1195 (5th Cir. 1992); (citing *Walther* v. *Lone Star Gas Co.*, 952 F.2d 119, 124 (5th Cir. 1992); *Hansard* v. *Pepsi-Cola Metropolitan Bottling Co.*, 865 F.2d 1461, 1465( 5th Cir. 1989)("where the only evidence of intent is oral testimony, a jury could always choose to discredit it.").

107.    See  *Heinsohn* v. *Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (holding that summary judgment was not proper in a discrimination case where the employer had *no* contemporaneous documentation to support its assertions of poor performance against the employee, and instead relied solely on *after-the-fact documentation* and *testimony from interested witnesses*)(emphasis added); see also *Burton* v. *Freescale Semiconductor, Inc.*, 798 F.3d at 239-40 (holding that the lack of contemporaneous documentation to support claims of poor performance may in appropriate cases be evidence of pretext, and reversing summary judgment that had been entered for the employer by the district court)

## X. ATTORNEYS FEES

108.   Pursuant to § 12205 of the Act, Plaintiff hereby seeks reasonable Attorneys Fees

including litigation expenses, and costs, in the event that the Plaintiff prevails.  Such fees

shall be submitted at the conclusion of a trial before a Court of competent jurisdiction,

submitted by affidavit by Plaintiff's Counsel, and testified to therein by same.

## XI.   JURY TRIAL DEMANDED

109.   Plaintiff hereby demands a trial by jury upon the merits of the case, and shall pay cost of

same prior to the advent of trial.

## XII. DAMAGES

110.   The damages under Section 1981 and Title VII consist of back-pay, front-pay (or

reinstatement), compensatory damages, punitive damages, attorney's fees, and costs.

Each component is explained below:

111.   **BACK PAY**.  Prevailing claimants under the anti-discrimination laws may recover lost

back-pay and benefits.  *See Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013).

The purpose of back pay is to "make whole the injured party by placing that individual in

the position he or she would have been in but for the discrimination."  *Sellers v. Delgado

Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

112.   **FRONT PAY**.  "Front pay refers to future lost earnings."  *Wal-Mart Stores v. Davis*, 979

S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied).  Regarding the calculation of front-

pay, the Fifth Circuit has stated that  "[f]ront pay is . . . calculated from the date of

judgment to age 70, or the normal retirement age, and should reflect earnings in

mitigation of damages." *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal

and Equitable Remedies Under the Age Discrimination in Employment Act, 45

MD.L.REV. 298, 330–334 (1986)).  *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367,

374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected

future damages caused by defendant's wrongful conduct from the date of judgment to

retirement.").

113.    **COMPENSATORY DAMAGES**.  Mrs. Macerola has suffered future pecuniary losses,

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other non-pecuniary losses, for which she seeks recovery in this lawsuit under Section

1981 and Title VII.  *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002)

(affirming $150,000.00 compensatory damages award under Section 1981 where the

plaintiff did not receive a position because of his race); 42 U.S.C. § 1981A(a)(1)

(providing for compensatory damages for such harms under Title VII).

114.    **PUNITIVE DAMAGES**.  The Defendants intentionally acted with malice and reckless

indifference to Mrs. Macerola's federally protected civil rights, thus justifying awards of

punitive damages under Section 1981 and Title VII.  *See, e.g.*, *Abner v. Kansas City*

*Southern Railroad Co.*, 513 F.3d 154, 164 (5th Cir. 2008) (affirming $125,000.00

punitive damages awards to each plaintiff under Section 1981, even though each plaintiff

was awarded only $1.00 in actual damages, and strongly suggesting that any punitive

damages award up to $300,000.00 per plaintiff would have been appropriate even in the

absence of any actual damages); *Hampton v. Dillard Dept. Stores*, 18 F. Supp. 2d 1256

(D. Kan. 1998) (awarding the plaintiff $1,100,000 in punitive damages in a Section 1981

race discrimination case); 42 U.S.C. § 1981A(a)(1) (providing for punitive damages under Title VII when the discrimination is shown to be with "malice or reckless indifference"). In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118 (1999) the U.S. Supreme Court, interpreting Title VII, held that to satisfy the "malice or reckless indifference" requirement, the plaintiff does not have to prove that the violation was egregious or outrageous. *Id*. at 535-36.

115.   All that is required is proof that the employer knew that it was acting in the face of a perceived risk that its actions were in violations of the law's prohibition against discrimination. *Id*.; *see also Schexnayder v. Bonfiglio*, 167 Fed. Appx. 364, 368 (5th Cir. 2006) ("a jury may award punitive damages pursuant to Title VII merely if the employer knew it *may have been* violating the law.") (italics in original).

116.   **ATTORNEY'S FEES**.  Attorneys fees are recoverable to a prevailing plaintiff under Section 1981 and Title VII.  *See Miller*, 716 F.3d at 149 (affirming an award of attorneys' fees of $488,437.08 to the plaintiff in a single-plaintiff discrimination case that arose in Dallas); *Lewallen v. City of Beaumont,* 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff discrimination failure to promote case); *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007) (awarding prevailing plaintiff in a single-plaintiff discrimination case tried in Houston $336,010.50 in attorneys' fees).

117.   Due to the unlawful discrimination and retaliation engaged in by the Defendant, Mrs. Macerola has experienced concrete economic harm in economic damages, as well as emotional distress.

118.   Moreover, damages are available for ADA retaliation claims. To understand the interaction between the relevant statutory provisions, it is necessary to recognize the basic structure of the ADA.  The ADA contains several sub-chapters commonly referred to as "Titles."   Title I governs "Employment,"  Title II governs "Public Services," and Title III governs "Public Accommodations and Services Operated by Private Entities."   See Title I, 42 U.S.C. §§ 12111 et seq.; Title II, 42 U.S.C. §§ 12131 et seq.; Title III, 42 U.S.C. §§12181 et seq. Each of these sub-chapters, or "Titles," contains its own remedies and enforcement provisions.

119.   Section 102 of Title I, 42 U.S.C. § 12112, prohibits employment-based 11Case: 09-5722 Document: 00618001637   Filed: 12/21/2009   Page: 17 discrimination, and section 107 of Title I, 42 U.S.C. § 12117, states that the remedies and procedures for violations of Title I are those remedies and procedures available pursuant to Title VII of the Civil Rights Act of 1964, including those found in section 706(g), 42 U.S.C. § 2000e-5(g).[10]

120.   Title V of the ADA, which is titled "Miscellaneous Provisions," contains section 503, 42 U.S.C. § 12203, which broadly prohibits retaliation and coercion under Titles I, II, and III.[11]

---

[10]Section 107(a) of the ADA, 42 U.S.C. § 12117(a), provides: Powers, remedies, and procedures. – The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title [sections 705, 706, 707, 709, and 710 of Title VII of the Civil Rights Act of 1964] shall be the powers, remedies, and procedures this sub-chapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter ...

[11]Sections 503(a) and (b) of the ADA, 42 U.S.C. §§ 12203(a) & (b), provide: (a) Retaliation. – No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. (b) Interference, coercion, or

121.   Unlike I, II, and III, however, Title V does not contain its own remedies and procedures provision.  Instead, section 503(c) of Title V states that the remedies and procedures available for employment-based retaliation claims under Title I are those remedies available under section 107, 42 U.S.C. § 12117. [12]

122.   This statutory scheme establishes that the remedies available for employment-based retaliation claims under section 503 are coextensive with the remedies available at section 107, 42 U.S.C. § 12117, which, in turn, are coextensive with the remedies available pursuant to Title VII, including those at section 706(g), 42 U.S.C. § 2000e-5(g).

123.   While section 706(g) does not authorize compensatory and punitive damages, in the 1991 Civil Rights Act, Congress amended 42 U.S.C. § 1981 to permit damages in Title VII and ADA cases, like this case, brought under section 706 to seek relief for intentional discrimination.   See 42 U.S.C. § 1981a(a)(1) (authorizing damages for Title VII cases brought under the powers of section 706);[13] 42 U.S.C. §

---

intimidation. – It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

[12]Section 503(c) of the ADA, 42 U.S.C. § 12203(c), provides: Remedies and procedures – The remedies and procedures available under sections 12117, 12133, and 12188 of this title [sections 107, 203, and 308 of the ADA] shall be available to aggrieved persons for violations of subsections (a) and (b) of the section, with respect to subchapter I, subchapter II and subchapter III, respectively, of this chapter.

[13] Section 1981a(a)(1) provides: In an action brought by a complaining party under 706 or 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5 or 2000e-16) against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act (42 U.S.C. 2000e-2, 2000e-3, or 2000e-16), ... , the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

1981a(a)(2) (authorizing compensatory and punitive damages in ADA cases brought under the powers of section 706).[14]

124.     Accordingly, because compensatory and punitive damages are available for Title VII violations under section 706(g), 42 U.S.C. § 2000e-5(g), they are also available under section 107 of the ADA, 42 U.S.C. § 12117 (which incorporates the remedies of section 706(g)), and therefore – pursuant to section 503(c) of the ADA (which incorporates the remedies and procedures of section 107 of the ADA) – for employment-based retaliation claims.

## XIII.   PRAYER

125.     Mrs. Macerola asks that she be awarded a judgment against the Defendants for the following:

a.     Actual damages including but not limited to pecuniary losses, non-pecuniary losses, Back-Pay, Front Pay, Compensatory Damages, and, Punitive Damages; in the sum of **$350,000.00**; and,

b.     Prejudgment and post-judgment interest;

c.     Attorney's fees and court costs; and,

d.     All other relief to which Plaintiff is entitled.

---

[14] Section 1981a(a)(2) provides: In an action brought by a complaining party under the powers, remedies, and procedures set forth in section 706 or 717 of the Civil Rights Act of 1964 (as provided in section 107(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12117(a)), ... against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) under ... section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112) ... the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

Respectfully Submitted,

_____/s/Julian Frachtman_____
H. Julian Frachtman
SDTX No.:     2695031
SBN:            24087536
tel: 832.499.0611
fax: 713.651.0819
Hfrachtmanlaw@gmail.com
3100 Richmond, Ste 203
Houston, Texas 77098

ATTORNEY FOR PLAINTIFF
KATRINA MACEROLA